[Crim. No. 329.   Fourth Appellate District.—April 10, 1936.]

THE PEOPLE, Respondent, v. R. B. HURLEY, Appellant.

Hodge & Evans for Appellant.

U. S. Webb, Attorney-General, and Walter L. Bowers, Deputy Attorney-General, for Respondent.

MARKS, J.—By an information filed by the district attorney of San Bernardino County the appellant and his brother, H. B. Hurley, were accused of the crime of manslaughter. Appellant was further accused of failing to stop and render aid after an accident. (Sec. 480, Vehicle Code.) The two cases were tried together, and upon the same evidence, by the court without a jury. H. B. Hurley was found not guilty. R. B. Hurley was found guilty on both charges. The latter has appealed from the judgments and from the orders denying his motions for new trial. We will refer to him as the appellant, and to H. B. Hurley as the defendant.

Appellant urges as his sole ground for reversal of the judgments and orders that the evidence introduced in support of

each charge was in each instance insufficient to support either judgment pronounced upon him.

A study of the record discloses the following facts: The appellant and the defendant were brothers. On November 9, 1935, the defendant purchased a second-hand Cord sedan in Los Angeles. On that day he and appellant drove to San Bernardino, their first stop on a trip to the Parker Dam site where they were going in search of employment. They each drank a glass of beer somewhere between Los Angeles and San Bernardino. Upon reaching San Bernardino they spent some time visiting friends and acquaintances. One of the brothers bought three whiskey sours which they shared with a friend. During the evening they resumed their journey but took a wrong road from San Bernardino. They stopped at a sandwich shop about eight miles out and got into a fight with the proprietor and another. They again resumed their journey with defendant driving. They came back through San Bernardino proceeding south on E Street to Highway No. 99. A short distance south of San Bernardino the road crosses the Santa Ana River. At the north end of the bridge over this river a road from the city of Colton intersects the highway at right angles forming a ''T''. As the Cord drove south along this highway a car was standing at a ''Stop'' sign on the Colton road at this intersection. When the Cord had passed, the stopped car made a right turn following the Cord over the bridge. This car was being driven by Howard T. Black whose wife and child were riding with him. Beyond the bridge the road makes two distinct curves to the left. Mr. Black testified that the Cord came almost to a full stop on the bridge and that in making these curves swung to the extreme left side of the roadway; that it returned to its own side of the road and after traversing the second curve it stopped; that he drove past it; that after traveling about one-half mile the Cord passed him and proceeded easterly on its own right-hand side of the road at a speed of 37 or 38 miles an hour; that he followed at a distance of about 100 feet; that he saw the body of a man fly from the side of the Cord into the gutter at the side of the roadway; that he saw broken glass flying from the Cord; that at that time the Cord had swerved to its left; that it proceeded about 100 feet and stopped; that he drove to the left-hand side of the Cord and stopped; that his wife put down the window in the right front

door of his car and said, ''You better go back and pick him up''; that he had no way of knowing whether this remark was heard by either of the Hurleys; that he drove on easterly along the highway about a block and a half and turned into a farm house where he attempted, without success, to arouse the occupants; that as he was backing from the driveway of this house the Cord passed proceeding easterly toward the city of Redlands; that he stopped at the police station in Redlands and reported the accident; that the accident happened at about one o'clock on the morning of November 10, 1935.

At about 6:30 o'clock on the morning of November 10, 1935, a truck driver saw Joseph Schwitz lying unconscious in the gutter on the south side of Highway No. 99, opposite broken glass on the right-hand side of that roadway. The truck driver secured aid and Schwitz was taken to the San Bernardino County hospital, where he died from a severe fracture of the skull, hemorrhage and injuries of the brain. One of his legs was broken and the autopsy surgeon stated it had been broken from a blow from the rear which would indicate Schwitz had been walking easterly along Highway No. 99, on his own right-hand side of the road when he was struck by the Cord automobile.

Highway No. 99, at the point of the accident, has a twenty-foot pavement in its center, with six-foot hard oiled shoulders on either side and added gravel shoulders about six feet in width. On the morning of November 10, 1935, broken glass was found on the southerly oiled shoulder opposite where Schwitz lay in the gutter. About twenty-three feet westerly from that point tire burns appeared on the southerly edge of the paved portion of the highway and proceeded northeasterly for a distance of twenty-seven feet. This would indicate that the driver of the Cord, upon seeing Schwitz in front of him, swerved to his left in an attempt to avoid the collision, and, that Schwitz had been walking on or close to the southerly edge of the paved portion of the highway.

At the time of its purchase the Cord had two glass wind wings. At the time of the arrest of the Hurley brothers both these wind wings were missing. There were scratches on the right front fender and a dent on the right rear fender with some paint missing on the right bracket which supported

the front bumper. There was hair similar to that of Schwitz in one of the hinges of the right rear door.

On the day of their arrest the defendant and the appellant made statements to the district attorney of San Bernardino County in which each denied that he was driving the car at the time of the accident. Later the appellant asked permission to correct the statement which he had made. In this corrected statement he said: "Well, I'm charged with manslaughter. They said I ran over a man and killed him and I did. . . . I hit the man. I said 'Harold, I hit some one,' and he says, 'You did?' and he got out of the car and he said 'Why I don't see nothing', and I says 'All right' and we drove on." He further stated that the defendant just stepped out of the door of the car and right back in again, and did not walk back, but merely looked back down the highway saying that the car must have hit a stick.

The defendant, in his statement, said that at the time of the accident he was asleep on the right-hand side of the front seat of the car and was awakened by broken glass flying into his face. When the car was stopped the first time the brothers changed places and appellant was driving at the time of the accident.

Both the Hurleys admitted that the right wind wing and the glass in the right front door of the Cord were broken in the collision. They further admitted taking the wind wings from the car and throwing them away, and also that they replaced the broken glass in the right front door. While on the witness stand they each told very different stories of their departure from San Bernardino than the ones contained in their statements to the district attorney.

▮ A mere statement of the evidence is sufficient to force the conclusion that it was entirely sufficient to support the conviction of the appellant under the charge of failing to stop and render aid after an accident. (*People* v. *McIntyre*, 213 Cal. 50 [1 Pac. (2d) 443].) Joseph Schwitz was a large man over six feet tall, weighing about one hundred eighty pounds. Appellant admitted hitting a man while driving a Cord automobile on Highway No. 99, west of the city of Redlands. That he did not know he had struck a human being is inconceivable in view of the admitted facts of the damage to the car and the necessary conclusion from the evidence that the body of Schwitz was thrown over

the right front fender of the car along its side, breaking the right wind wing and the glass in the right front door, his head coming into violent collision with a hinge on the right rear door. All these things could hardly happen without appellant being conscious that the car he was driving had hit a human being. The judgment against appellant, and the order denying his motion for new trial under the charge of failure to stop and render aid after an accident, must be affirmed.

■ The question of the sufficiency of the evidence to support the judgment in the case in which involuntary manslaughter was charged presents more difficulties.

Section 192 of the Penal Code defines involuntary manslaughter as follows: ''Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: . . . Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.'' ·

It is only suggested that appellant was engaged in the commission of an unlawful act at the time of the accident, namely, driving while under the influence of intoxicating liquor. The sole evidence supporting any such theory is the liquor consumed by appellant on November 9th, and the manner in which the automobile was driven in crossing the Santa Ana River bridge and in rounding the two curves of the road. The undisputed evidence shows that defendant, and not appellant, was driving the car across the bridge and around the curves. The manner of driving at those times can have no bearing on the question of the sobriety of appellant. The only other evidence bearing on this subject is the admission of appellant that he had consumed one beer on the trip from Los Angeles to San Bernardino and one whiskey sour in the latter city. The beer was imbibed more than seven hours, and the whiskey several hours, before the accident. This evidence is insufficient to sustain the burden placed on the people in criminal cases of proving the material and necessary elements of the offense charged beyond a reasonable doubt. ■ Therefore, the conviction of appellant of involuntary manslaughter must be upheld, if at all, under the theory that he was engaged ''in the commission of a lawful act which might produce death, in an unlawful

manner, or without due caution and circumspection." We are not referred to any unlawful act committed by appellant at the time of the accident and therefore must determine the sufficiency of the evidence by answering the question: Was he acting "without due caution and circumspection" at that time?

This is the question to which the attorney-general devotes his chief attention in his brief. He bases his argument upon the rule well established in civil cases that a driver of an automobile is required to watch for vehicular and pedestrian traffic that may be upon the highway in front of him and that his negligence may be inferred from his failure to do so. He cites numerous cases where judgments for damages have been affirmed when the triers of the facts had predicated negligence upon the failure of defendants to perform this duty. Were this a civil action in which Schwitz had recovered judgment against appellant, it must be conceded that a finding of negligence on the part of the driver of the car would probably be affirmed on appeal. This brings us to the question of whether the rule in civil cases of the degree of lack of "due caution and circumspection" which will support a judgment will also support a judgment in a prosecution for involuntary manslaughter.

We have studied many California cases in which the crime of involuntary manslaughter was considered where the death of deceased was caused by having been struck by an automobile which was being driven by the defendant. In several of these cases it is stated that the driver would be guilty if he operated his automobile without due caution and circumspection. From this it is argued that the guilt would be equally established if it were considered that the operation was without due or ordinary care. In these cases there appears either the violation of an express statute or a wanton and reckless disregard of the safety of another. (For examples, see, *People* v. *Wilson,* 193 Cal. 512, [226 Pac. 5]; *People* v. *Collins,* 195 Cal. 325 [233 Pac. 97]; *People* v. *Marconi,* 118 Cal. App. 683 [5 Pac. (2d) 974]; *People* v. *Frantz,* 138 Cal. App. 499 [32 Pac. (2d) 670].)

Section 20 of the Penal Code provides that: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." In the instant case it is admitted there was no intent on the part

of appellant to kill Schwitz. Therefore, when applied to the facts before us, the section must be read as requiring proof of union, or joint operation of act, and criminal negligence. It is true that section 192 of the Penal Code in no manner refers to criminal negligence but bases the criminal responsibility of a defendant upon his acting without due caution and circumspection. It is well settled that the various sections of the code must be construed together so as to bring all provisions into harmonious operation. If it is necessary that before a crime such as we are here considering can be committed there "must exist a union, or joint operation of act and . . . criminal negligence" it should necessarily follow that the lack of "due caution and circumspection" referred to in section 192 of the Penal Code must be construed as the equivalent of criminal negligence. To conclude otherwise would destroy the clear meaning of section 20 of the same code. (See *People* v. *Kilvington,* 4 Cal. Unrep. 512 [36 Pac. 13].)

The court said in *People* v. *Sidwell,* 29 Cal. App. 12 [154 Pac. 290], after quoting section 192 of the Penal Code: "Thus it will be observed that, while involuntary manslaughter may be committed in two different ways, the legislature has not recognized, as between those two ways, any distinction in the degree of turpitude characterizing that crime. In other words, the crime is that of involuntary manslaughter, whether the killing be committed in the execution of an unlawful act, etc., or in the execution of a lawful act, etc., or where death, not wilfully or intentionally produced, is, nevertheless, caused by the gross or culpable negligence of the defendant—negligence which, in degree, goes so far beyond that negligence merely which suffices to impose a civil liability for damages as to constitute it criminal negligence for which the party guilty of it may be held criminally liable."

In the case of *People* v. *Seiler,* 57 Cal. App. 195 [207 Pac. 396], the District Court of Appeal, by *dicta,* in defining involuntary manslaughter in the performance of a lawful act used the words "in a wanton, reckless, or culpable manner", as the equivalent of "without due caution and circumspection". In criticizing this definition when denying a petition for hearing the Supreme Court said: "In order to constitute this kind of manslaughter the act may be lawful but it must

be one which might produce death, and which does produce death, and it must be committed without due caution and circumspection. The lack of due caution and circumspection need not go to the extent of being wanton or reckless, although it' might possibly be such as would be defined as culpable. But the word 'culpable' is not an apt description of the idea intended to be conveyed by the words 'due caution and circumspection'. On this subject see note II to the case *Johnson* v. *State,* (1902) 61 L. R. A. 277.''

A reading of the available cases cited in the note referred to leads to the conclusion that it is the prevailing rule that the want of care that will support a conviction of involuntary manslaughter committed while performing a lawful act must be more than simple negligence and must at least equal gross negligence. Mr. Justice Field, in *United States* v. *Knowles,* 4 Sawy. 517, Fed. Cas. No. 15,540, a much cited case, expressed the opinion that the breach of duty must be one either imposed by law or contract, or that the duty omitted must be plain, and one that does not permit of discussion of its obligatory force or difference of opinion on the course of conduct pursued. In *Thomas* v. *People,* 2 Colo. App. 513 [31 Pac. 349], the court stated the true rule to be, that the defendant must be charged with an omission in the performance of a duty under which there appeared his ''gross negligence essential to the commission of the crime''. In other of the cited cases there was either violation of law or wanton disregard of the safety of another.

In a rather extensive study extending beyond anything cited in the briefs we have found no case where a conviction was had and sustained under the facts presented by the record here, though there are statements in many cases, when divorced from their facts, which would tend to support the conclusion reached by the trial judge here. The great majority of the cases support the conclusion reached by us that where the defendant is charged with involuntary manslaughter committed in the performance of a lawful act the evidence must show him guilty of criminal negligence or the conviction cannot be upheld.

In *People* v. *Driggs,* 111 Cal. App. 42 [295 Pac. 51], criminal negligence is thus defined: ''As the cause must go back for another hearing, it is incumbent for us to call attention to at least one other point urged by the respondent relative

to one of the instructions given to the jury. The record shows that the trial court gave to the jury as one of its instructions, section 20 of the Penal Code, reading as follows: 'In every crime or public offense, there must exist a union or joint operation of act or intent of criminal negligence.' And then, as a definition of 'criminal negligence', the following: 'the words "neglect", "negligence", "negligent", and "negligently" import a want of such attention to the nature or probable consequences of the act, or omission, as a prudent man ordinarily bestows in acting in his own concerns'. Though found in the Penal Code, this definition of 'negligence' is only of an act which fixes civil liability; it is the definition of the kind of act which fixes responsibility upon, for instance, drivers of automobiles, where no criminal element whatever is involved. In order to constitute criminal negligence, there must enter into the act some measure of wantonness or flagrant or reckless disregard of the safety of others, or wilful indifference. If no one of these elements enters into the act, the person charged cannot be held guilty of criminal negligence." (See, also, *Schultz* v. *State,* 89 Neb. 34 [130 N. W. 972, Ann. Cas. 1912C, 495, 33 L. R. A. (N. S.) 403]; *Omaha & R. V. R. Co.* v. *Chollette,* 33 Neb. 143 [49 N. W. 1114]; *Carbo* v. *State,* 4 Ga. App. 583 [62 S. E. 140]; *State* v. *Goetz,* 83 Conn. 437 [76 Atl. 1000, 30 L. R. A. (N. S.) 458]; *Chicago, R. I. & P. R. Co.* v. *Zernecke,* 183 U. S. 582, 22 Sup. Ct. 229, 46 L. Ed. 339; *Jones* v. *Chicago etc. Co.,* 260 Fed. 929; *State* v. *Agnew,* 202 N. C. 755 [164 S. E. 578].)

The only failure of appellant to perform a required duty which is pointed out by the attorney-general, and the record sustains him, was the failure to so carefully observe the road in front of him that he could have seen Schwitz in time to avoid hitting him. Did this failure to observe constitute criminal negligence?

The driving of automobiles at night is now such a general and common practice that we can draw on our own knowledge in weighing the culpability of appellant under the circumstances before us. The night was dark but clear and the roadway was dry. There was little traffic. The Cord's lights were illuminated and in good order. Appellant was driving on his own right-hand side of the road and at a moderate speed. Deceased was walking on the wrong side of

the road and several feet inside the right-hand edge of the improved oiled shoulder. When twenty-three or more feet from the point of impact appellant applied the brakes with sufficient force to cause skid marks on the pavement and swerved his car to the left to avoid the collision. Every driver, even the most careful and alert, has experienced the difficulty of seeing a pedestrian walking at night down the roadway in front of him. While contributory negligence of the deceased is no defense in a manslaughter prosecution, still it may have an important bearing on the degree of culpability of appellant. The law required Schwitz to walk close to his left-hand edge of the roadway. (Sec. 564, Vehicle Code.) Had he obeyed the law there would have been no collision as he would not have been in the path of the Cord. Appellant had the right to assume that pedestrians would obey the law and that no one would be walking down the road in the path of his automobile. While this would not excuse him from keeping a vigilant watch of the roadway in front of his car, it has an important bearing on the degree of his lack of care.

Under the facts of this case, and the decisions we have cited, we have reached the conclusion that the evidence shows appellant guilty of only the lack of the exercise of ordinary care, and not of gross indifference to or such a disregard of the safety of others as is necessary to constitute criminal negligence. It follows that the judgment pronounced upon him upon his conviction of involuntary manslaughter, and the order denying his motion for new trial made in that case, must be reversed.

It is ordered, (1) that the judgment pronounced upon appellant, and the order denying his motion for new trial under the charge of failure to stop and render aid after an accident, are affirmed, and, (2) that the judgment pronounced upon appellant, and the order denying his motion for new trial under the charge of manslaughter, are reversed.

Barnard, P. J., and Jennings, J., concurred.